# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 08-**_____ |
| **v.** | : | **DATE FILED: December 11, 2008** ___ |
| **MARK JOHNSON** | : | **VIOLATIONS:** |
| **MARC MANOFF** | | **18 U.S.C. § 371 (conspiracy - 1 count)** |
| **KYLE GOTSHALK** | : | **15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R.** |
| **LEONARD GOTSHALK** | | **§ 240.10b-5 (securities fraud - 2 counts)** |
| | : | **18 U.S.C. § 2 (aiding and abetting)** |

## INDICTMENT

## COUNT ONE

**THE GRAND JURY CHARGES THAT:**

## BACKGROUND

At all times relevant to this indictment:

1.      Exit Only, Inc. ("Exit Only") was a Nevada corporation based in California that described itself as an "emerging growth company that owns Text4cars.com, an internet based community for new and used vehicles."  Exit Only was publicly traded under the ticker symbol "EXTO" on the Pink OTC Markets Inc., an inter-dealer electronic quotation and trading system in the over-the-counter ("OTC") securities market commonly referred to as the "Pink Sheets."

2.      CX2 Technologies, Inc., ("CX2") was a Nevada corporation based in Florida that described itself as "engaged in the development, operation and management of 220 MHz digital wireless data communications services."  CX2 was publicly traded under the ticker symbol "CXTO" on the Pink Sheets.

3.      The companies traded on the Pink Sheets tend to be closely held,

extremely small, and/or thinly traded.  Most do not meet the minimum listing requirements for

trading on a national securities exchange, such as the New York Stock Exchange or the

NASDAQ Stock Market.

4.      Defendants MARK JOHNSON and MARC MANOFF were partners in a

company called Marck Capital Partners, LLC ("Marck Capital"), which described itself as a

"leading consulting firm focusing on raising money for both privately held companies and public

companies and helping take companies public through the reverse merger process."  According

to its website, Marck Capital maintained offices in Baltimore, Maryland, and "Suburban

Philadelphia."

5.      Defendant KYLE GOTSHALK was a California resident and the

chairman and CEO of Exit Only who owned and/or controlled significant blocks of shares in

Exit Only and CX2 (together, the "Target Stocks").

6.      Defendant LEONARD GOTSHALK was an Oregon resident and

defendant KYLE GOTSHALK's father, who also owned and/or controlled significant blocks of

shares in the Target Stocks.

7.      The United States Securities and Exchange Commission (the "SEC") was

an independent agency of the United States which was charged by law with the duty of

protecting investors by regulating and monitoring, among other things, the purchase and sale of

publicly traded securities, including securities traded on the Pink Sheets.  Federal securities laws

prohibited fraud in connection with the purchase and sale of securities, including the

manipulation of security prices by engaging in "matched trades."  A matched trade is an order to

buy or sell securities that is entered with knowledge that a matching order on the opposite side of the transaction has been or will be entered for the purpose of (1) creating a false or misleading appearance of active trading in any security registered on a national securities exchange; or (2) a false or misleading appearance with respect to the market for any such security.

## **THE CONSPIRACY**

8.      From in or about January 2008 through in or about March 2008, in the Eastern District of Pennsylvania, and elsewhere, defendants

**MARK JOHNSON,**
**MARC MANOFF,**
**KYLE GOTSHALK, and**
**LEONARD GOTSHALK**

conspired and agreed, together and with others known and unknown to the grand jury, to commit an offense against the United States, that is, to willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and the facilities of national securities exchanges, use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by:  (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon any person, in connection with the purchase and sale of a security, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

**MANNER AND MEANS**

9.     It was a part of the conspiracy that defendants MARK JOHNSON, MARC

MANOFF, KYLE GOTSHALK, and LEONARD GOTSHALK and their co-conspirators sought

to artificially inflate the price of the Target Stocks by causing manipulative market activity in the

Target Stocks that was designed to appear to be the product of free and fair market forces.  They

did this in various ways, including the following:

a.     Agreeing to engage in manipulative and deceptive securities

transactions artificially to increase the Target Stocks'  share prices.

b.     Entering into illegal agreements to orchestrate their trading activity

to create the false impression of market demand for the Target Stocks.

c.     Coordinating trading activity with issuing press releases in the

Target Stocks to provide a false pretext for the increased trading volume in the Target Stocks.

d.     Agreeing to secretly bribe brokers to cause their retail customers to

purchase and hold shares of the Target Stocks.

**OVERT ACTS**

10.     In furtherance of the conspiracy and to accomplish its objects, defendants

MARK JOHNSON, MARC MANOFF, KYLE GOTSHALK, LEONARD GOTSHALK, and

their co-conspirators committed the following overt acts, among others, in the Eastern District of

Pennsylvania and elsewhere:

a.     On or about January 23, 2008, defendants JOHNSON and

MANOFF met with the an individual who was secretly cooperating with the government

(identified here as the "CW")  in Wayne, Pennsylvania, to discuss manipulating publicly traded

4

stocks.  At this meeting, the CW told defendants JOHNSON and MANOFF that the CW could

introduce them to an individual (the "UC") who could help them manipulate stocks by paying

secret bribes to brokers in exchange for purchasing stocks in their clients' accounts.  In reality,

the UC was a Special Agent of the Federal Bureau of Investigation ("FBI") acting in an

undercover capacity.

        b.      On or about February 25, 2008, defendants JOHNSON and

MANOFF met with the CW and the UC in Philadelphia, Pennsylvania, to discuss the

manipulation of the Target Stocks.

        c.      On or about March 3, 2008, defendant JOHNSON informed the

CW that defendant JOHNSON was in the process of "rewriting" news for the Target Stocks and

that he was going to provide shareholder lists to the UC.

        d.      On or about March 7, 2008, defendant KYLE GOTSHALK

emailed defendant JOHNSON a spreadsheet identifying where virtually all of the outstanding

Exit Only shares were being held.

        e.      On or about March 7, 2008, defendant JOHNSON and the UC

discussed by telephone a "buying program" for the Target stocks.  In this discussion, defendant

JOHNSON explained that he had already raised the price of Exit Only from four cents to seven

cents per share based on trading volume from "friends and family," including defendants KYLE

GOTSHALK and LEONARD GOTSHALK.  Defendant JOHNSON said that he would provide

the UC with upcoming press releases and shareholder lists before the UC and his brokers made

the stock purchases.  Defendant JOHNSON stated that he wanted the UC to purchase

approximately $5,000 to $10,000 of Exit Only stock every other day for twelve to fifteen days.

5

After that buying program was concluded, defendant JOHNSON said he would likely use a "phone room" or mailing campaign to generate interest in Exit Only stock based in part on the artificial trading generated during the buying program.  Defendant JOHNSON confirmed that they would pay kickbacks for purchases in the Target Stocks, and the UC informed him that the brokers would attempt to buy the shares of the Target Stocks in accounts of clients who could absorb the losses.

       f.      On or about March 10, 2008, defendant JOHNSON emailed the UC the Exit Only shareholder lists he had received from defendant KYLE GOTSHALK and eight non-public press releases relating to Exit Only.  One of these press releases was made public the following day.

       g.      On or about March 10, 2008, defendant JOHNSON emailed the UC a CX2 shareholder list, two non-public CX2 press releases, and the titles of other non-public CX2 press releases.  One of these press releases was made public on March 20, 2008.

       h.      On or about March 11, 2008, defendant JOHNSON informed the UC by telephone that defendant JOHNSON had stock transfer agents under his control and inquired when the UC wanted more news released about the Target Stocks.

       i.      On or about March 17, 2008, defendant JOHNSON had a telephone conversation with the UC in which he agreed to pay the UC a fifteen-percent kickback to bribe brokers to purchase the Target Stocks in their clients' accounts.  Defendant JOHNSON explained that the UC would be buying the Exit Only stock from defendant KYLE GOTSHALK.

j.      On or about March 17, 2008, defendant JOHNSON telephoned the UC to inform him that he was prepared to issue press releases in conjunction with the UC's purchases in the Target Stocks.

k.      On or about March 19, 2008, defendant JOHNSON telephoned the UC to inform him that he had issued press releases relating to Exit Only.

l.      On or about March 20, 2008, at the direction of defendant JOHNSON, the UC caused purported retail purchases to be made of approximately 200,000 shares of Exit Only stock at approximately five cents per share for a total of approximately $10,000.  Those trades were settled using undercover FBI funds.  This was a matched trade with defendant LEONARD GOTSHALK as the seller of these shares.

m.      On or about March 24, 2008, defendant LEONARD GOTSHALK caused approximately $1,500 to be wired into to an undercover account maintained by the FBI at a financial institution in Philadelphia, Pennsylvania, as a kickback for the purchases that the UC caused in Exit Only stock.

n.      On or about March 24, 2008, defendant MANOFF spoke on the telephone with the UC and explained to him that defendants KYLE GOTSHALK and LEONARD GOTSHALK were their "partners on the deal" and that they were responsible for paying the kickbacks to the UC because the UC was buying the stock from them.

o.      On or about March 24, 2008, at the direction of defendant JOHNSON, the UC caused purported retail purchases to be made of approximately 217,021 shares of Exit Only stock at approximately 4.6 cents per share, for a total of approximately $10,000.  Those trades were settled using undercover FBI funds.

7

p.      On or about March 26, 2008, defendants JOHNSON, KYLE GOTSHALK, and LEONARD GOTSHALK spoke together on the telephone with the UC and discussed manipulating the Target Stocks and the potential for "bigger" deals in the future. During this call, they discussed getting Exit Only stock "walked up" to as much ten cents per share (or more than double the stock price at that time) so that defendants KYLE GOTSCHALK and LEONARD GOTSHALK could sell their Exit Only shares at a substantial profit. Defendants KYLE GOTSCHALK and LEONARD GOTSHALK also stated that they would not reveal to other shareholders that they were paying  kickbacks to the UC to purchase Exit Only stock.

q.      On or about March 27, 2008, defendant JOHNSON telephoned the UC to obtain further wiring instructions for the kickback payment.

r.      On or about March 27, 2008, defendant LEONARD GOTSHALK caused approximately $1,500 to be wired into an undercover account maintained by the FBI at a financial institution in Philadelphia as a kickback for the purchases that the UC caused in Exit Only  stock.

s.      On or about March 28, 2008, defendant JOHNSON spoke to the UC on the telephone about manipulating CX2 stock.  Defendant JOHNSON said that he would lower the offer price on CX2 stock to approximately thirteen cents per share so that the UC could get a better price on his purchases.

t.      On or about March 28, 2008, at the direction of defendants JOHNSON, KYLE GOTSHALK, and LEONARD GOTSHALK, the UC caused purported retail purchases to be made of approximately 104,000 shares of Exit Only stock at approximately 4.8

cents per share, for a total of approximately $4,992.  Those trades were settled using undercover FBI funds.  This was a matched trade with defendant LEONARD GOTSHALK as the seller of these shares.

u.      On or about March 28, 2008, at the direction of defendants JOHNSON, KYLE GOTSHALK, and LEONARD GOTSHALK, the UC caused purported retail purchases to be made of approximately 39,000 shares of CX2 stock at approximately thirteen cents per share, for a total of approximately $5,070.  Those trades were settled using undercover FBI funds.  This was a matched trade with defendant LEONARD GOTSHALK as the seller of these shares.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO

**THE GRAND JURY FURTHER CHARGES THAT:**

1.    Paragraphs 1 through 7 and 9 and 10 of Count One are incorporated here.

2.    From in or about January 2008 through in or about March 2008, in the

Eastern District of Pennsylvania and elsewhere, defendants

**MARK JOHNSON,**
**MARC MANOFF,**
**KYLE GOTSHALK, and**
**LEONARD GOTSHALK**

willfully and knowingly, by the use of the means and instrumentalities of interstate commerce

and the facilities of national securities exchanges, directly and indirectly, used and employed

manipulative and deceptive devices and contrivances, and aided and abetted the use and

employment of manipulative and deceptive devices and contrivances, in violation of Title 17,

Code of Federal Regulations, Section 240.10b-5, by:  (a) employing devices, schemes, and

artifices to defraud; (b) making untrue statements of material fact and omitting to state material

facts necessary in order to make the statements made, in light of the circumstances under which

they were made, not misleading; and (c) engaging in acts, practices, and courses of business

which operated and would operate as a fraud and deceit upon other persons in connection with

purchases and sales of Exit Only stock.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17,

Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

## **COUNT THREE**

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.   Paragraphs 1 through 7 and 9 and 10 of Count One are incorporated here.

      2.   From in or about January 2008 through in or about March 2008, in the

Eastern District of Pennsylvania and elsewhere, defendants,

**MARK JOHNSON,**
**MARC MANOFF,**
**KYLE GOTSHALK, and**
**LEONARD GOTSHALK**

willfully and knowingly, by the use of the means and instrumentalities of interstate commerce

and the facilities of national securities exchanges, directly and indirectly, used and employed

manipulative and deceptive devices and contrivances, and aided and abetted the use and

employment of manipulative and deceptive devices and contrivances, in violation of Title 17,

Code of Federal Regulations, Section 240.10b-5, by:  (a) employing devices, schemes, and

artifices to defraud; (b) making untrue statements of material fact and omitting to state material

facts necessary in order to make the statements made, in light of the circumstances under which

they were made, not misleading; and (c) engaging in acts, practices, and courses of business

which operated and would operate as a fraud and deceit upon other persons in connection with

purchases and sales of CX2 stock.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

**A TRUE BILL:**


_____

**GRAND JURY FOREPERSON**


_____
**LAURIE MAGID**
**Acting United States Attorney**